[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15313

_____

D.C. Docket No. 1:11-cr-20813-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL TALTON WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 2, 2013)

Before HULL and MARTIN, Circuit Judges, and HINKLE,* District Judge.

HULL, Circuit Judge:

_____

*Honorable Robert L. Hinkle, United States District Judge for the Northern District of
Florida, sitting by designation.

After a jury trial, defendant Michael Talton Williams appeals his convictions for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g), possession with intent to distribute a detectable amount of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).  Defendant Williams attacks his convictions on two general grounds, arguing that: (1) a firearm introduced into evidence at trial was obtained during an unlawful search; and (2) the district court erred during jury selection by sustaining the government's objection under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), and thus depriving him of one of his peremptory strikes.  He also attacks his § 924(c)(1)(A) firearm conviction by contending that there was insufficient evidence that he possessed a firearm in furtherance of a drug trafficking crime.  After careful review, and with the benefit of oral argument, we affirm Williams's convictions.

We begin by setting forth the evidence of Williams's offenses that was introduced at trial.  We then address Williams's Fourth Amendment and sufficiency of the evidence arguments, as those issues pertain to the trial evidence.  Afterwards, we return to the peremptory strike issue, describing the jury selection in Williams's case and explaining why any error by the district court does not entitle Williams to relief.

## I.  ARREST AND SEIZURE OF EVIDENCE

We first describe Williams's March 24, 2011 arrest by Miami, Florida police officers.  This arrest, and the evidence obtained from Williams during the arrest, eventually formed the basis of the federal prosecution in this case.  We base our description on the evidence presented at trial, as well as testimony given during a pretrial suppression hearing.  We highlight the conflicting accounts of certain events.

## A.    Officers' Arrival at the Rooming House

On March 24, 2011, at around 6:15 PM, Officers Raul Delgado and Ivan Moreno of the City of Miami Police Department went to a "rooming house" located at 3531 Grand Avenue in the Coconut Grove area of Miami, Florida.  At trial, Officer Delgado described the rooming house as "a two floor building" which had individual apartments for tenants and communal hallways, bathrooms, and a kitchen.

Officers Delgado and Moreno went to the rooming house on that day to investigate "narcotics complaints."  The police department had received many reports that drugs were being sold from the rooming house.  Prior to March 24, Officer Moreno had "made numerous arrests there" and had "done numerous surveillances" of the rooming house.

Officer Delgado had also been there many times.  He testified at the suppression hearing that the owner of the rooming house had given him a key to

3

the house.  The owner had also authorized Officer Moreno to "check up on the propert[y]."

## B.    Initial Encounter with Williams

When the officers arrived, Officer Delgado exited the passenger side of their marked police car, walked to the front door of the rooming house, and knocked on the door.  Officer Moreno, meanwhile, remained in the police car.  Both officers were dressed in full uniform.  Defendant Williams answered the door.  According to Officer Moreno, Williams appeared nervous upon opening the door, and he kept "looking around."  A conversation followed, during which Officer Delgado stood just outside the door frame, while Williams stood in the threshold of the door.

Officer Delgado testified at trial about the conversation that followed.  According to Officer Delgado, he asked Williams if he (Williams) lived at the rooming house, to which Williams said, "Yes."  Officer Delgado then asked Williams whether he (Williams) "had anything illegal on him."  Williams said, "No."  Officer Delgado next asked Williams whether he could search him (Williams).  Williams said, "Go ahead.  I ain't got nothing."

While Officer Delgado was talking to Williams, Officer Moreno exited the vehicle and approached the rooming house.  He got to within ten feet of where Officer Delgado and Williams were standing, but he could not hear what the two

men were saying.  As he got close to Williams, Officer Moreno noticed "a bulge" in Williams's waistband.

During the pretrial suppression hearing, Williams described the conversation differently.  According to Williams, Officer Delgado asked him (Williams) if he had any drugs; Williams replied "I don't have no drugs on me."  Officer Delgado then asked Williams, "You mind if I search you?"  Williams answered, "If you search me for what?"  To which Officer Delgado asked, "What are you hiding?"  According to Williams, Williams stated that he was not "hiding nothing," and Officer Delgado said, "Well, let's take a look."

## C.    Officer Delgado's Attempt to Search Williams

Next, Officer Delgado reached for Williams's pockets to search him.  As Officer Delgado leaned forward, Williams pushed him in the upper chest area causing the officer to stumble backwards (although he did not fall to the ground).

At trial, Officer Moreno, who observed the altercation from outside the police vehicle, testified that Williams shoved Officer Delgado with both hands at "full force."  During the suppression hearing, Williams stated that he only "push[ed] [Officer Moreno's] hands away."  Williams testified that he did so "because [he] already refused [Officer Delgado] consent to search . . . and [Officer Delgado] tried to search . . . by using force."

## D.    Officers' Chase of Williams into the Rooming House

In any event, it was undisputed that Williams next ran back inside the rooming house. After regaining his footing, Officer Delgado called out for Williams to stop, but Williams "kept on running." Officer Delgado, joined by Officer Moreno, chased Williams into the rooming house. Williams attempted to enter an apartment, but the door was locked and would not open when Williams pushed it with his shoulder. Next, Williams attempted to exit the building through a rear door, but that door was also locked.

**E.    Struggle and Arrest of Williams**

Again, there was conflicting testimony about what happened next. Officer Delgado testified at trial that, after Williams was unable to exit the building, he turned around and "took a fighting stance." Likewise, Officer Moreno stated that Williams "basically just took a fighting stance with his clinched fist as he was ready to fight with us." Officer Delgado testified that he tried to take Williams into custody, but Williams resisted and both Officer Delgado and Williams "ended on the ground." Officer Moreno described the events similarly. Officer Moreno added that, although the officers ordered Williams to put his hands behind his back "numerous times," Williams refused to do so. Instead, Williams "was pushing and pulling" and "would reach down to his waistband as they were fighting."

As the officers wrestled with Williams on the ground, Williams continued to reach for his waistband. The officers attempted to put handcuffs on Williams, but

6

were unable to do so.  They also tried to subdue Williams by using their taser weapons to "dry stun" him, but the tasers had little effect.  In fact, Williams attempted to take the taser from Officer Moreno, and the taser wound up on the ground.  Officer Delgado picked up the taser and tried to use it on Williams, but the taser still did not subdue Williams.

Williams tried to get away from the officers by crawling into a communal bathroom.  Before Williams fully entered the bathroom, Officer Moreno grabbed Williams by his feet and pulled him backwards.  When Officer Moreno lost his grip on Williams's legs and stumbled backwards, Williams "started doing . . . flutter kicks, kicking his feet in the air."

At that time, Officer Moreno saw a black semiautomatic handgun fall out of Williams's waistband and land "directly next to [Williams] on the right-hand side." Standing just two feet away, the gun caused Officer Moreno to fear for his and Officer Delgado's lives.  Officer Moreno "immediately got on top of . . . Williams and began striking him, giving him loud verbal commands to put his hands behind his back."  Williams continued resisting.  With Officer Delgado's help, Officer Moreno was able to handcuff Williams and finally subdue him.  Officer Delgado "grabbed" Williams, while Officer Moreno recovered the handgun from the ground.

7

Williams described the altercation in the hallway differently. He testified that, as he was trying to open the locked back door, the officers "snatch[ed] [him] down from behind." According to Williams, when the officers "snatch[ed] [him]," he did not have a firearm on his person. Williams stated that the officers "beat [him]" and were "tasing [him]." He testified, "I'm telling them, all right. They telling me, don't resist, and I'm telling him I ain't resisting." Williams specifically denied resisting the officers' attempts to arrest him. He stated that he was "trying to ball up" while the officers were "tasing [him] and pounding [him]."

## F.    Search of Williams Incident to Arrest

Regardless, it is undisputed that after the arrest but before the officers and Williams exited the rooming house, Officer Delgado searched Williams. In Williams's left front pocket, Officer Delgado found a cigarette box containing: (1) 21 orange-tinted bags containing crack cocaine; and (2) 4 green-tinted bags containing powder cocaine. In Williams's right front pocket, Officer Delgado found another cigarette box, this one containing: (1) some cigarettes; (2) "a little piece of marijuana"; and (3) approximately $236 cash.

While Officer Delgado searched Williams, Officer Moreno held on to the gun that had fallen out of Williams's pants. Later, police officers examined the gun and determined that it was a Glock 9 millimeter pistol. Inside the pistol was a magazine loaded with 10 live rounds of ammunition.

8

Williams admitted during the pretrial hearing that the drugs and cash recovered from his pockets were his. However, he stated that the gun was not his, testifying: "I didn't have a gun. I never seen a gun."

## G.    Williams's Post-Arrest Conduct

After they arrested and searched Williams, Officers Delgado and Moreno walked him out of the rooming house and placed him in the back of the police car. Once inside the car, Williams continued to act aggressively by kicking the car door.

According to Officer Moreno, while in the vehicle, Williams stated that he had run because he had "some—a couple of bags of dupe [sic] on [him]." Officer Moreno also testified at the suppression hearing that Williams said, "And, the gun is not mine. That's where we keep it."

## II.  PRETRIAL PROCEEDINGS

We now turn to the procedural history in this case, including Williams's not guilty plea, the district court's denial of Williams's pretrial suppression motion, and Williams's convictions after a jury trial.

## A.    Indictment and Not Guilty Plea

Approximately eight months after city police officers arrested Williams, a federal grand jury in the Southern District of Florida indicted him based on the events that led to his arrest. The indictment contained three counts: (1) possession

9

of a firearm after having been convicted of a felony, in violation of 18 U.S.C.

§ 922(g)(1) ("count one"); (2) possession with intent to distribute crack cocaine, in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) ("count two"); and (3)

possession of a firearm in furtherance of a drug trafficking crime, in violation of 18

U.S.C. § 924(c)(1)(A) ("count three").

Williams pleaded not guilty to the offenses, and the district court scheduled

the case for a jury trial.

## B.    Williams's Suppression Motion

Before trial, Williams filed a motion to suppress evidence obtained during

the March 24, 2011 events, including "the firearm, crack cocaine, currency and

statements."  Williams argued that the government had obtained this evidence as a

result of an illegal, nonconsensual search, and therefore the evidence was

inadmissible.  Williams offered three arguments for why the evidence should be

excluded: (1) the officers initially confronted him without probable cause to

conclude or reasonable suspicion that Williams was dealing drugs; (2) even if the

initial encounter was valid, Officer Delgado's attempt to search Williams was

invalid because Williams never consented to being searched; and (3) even if

Williams consented to being searched, he subsequently withdrew his consent by

pushing Officer Delgado.

## C.    Evidentiary Hearing and Denial of Suppression Motion

10

After the government responded in opposition to the suppression motion, the district court conducted an evidentiary hearing. During that hearing, Officers Delgado and Moreno testified for the government. They described the March 24, 2011events as described above. Williams also testified on his own behalf, offering his conflicting version of the events.

After the hearing, the district court issued an order denying the motion to suppress. The district court first acknowledged the conflicting testimony about whether Williams consented to being searched by Officer Delgado while the two of them stood at the door of the rooming house. The district court made a factual finding that Williams did consent to the search "[b]ased on the credibility of the Government's witnesses and the lack of credibility of the Defendant." The district court gave specific reasons for its finding that Williams was not a credible witness.

The district court also rejected Williams's argument that he had revoked consent by deflecting Officer Delgado's arm. The district court concluded that Officers Delgado and Moreno: (1) initially approached the rooming house pursuant to a permissible "walk and talk investigation"; (2) had probable cause to pursue Williams into the rooming house and there arrest him, based on Williams's assault of Officer Delgado; and (3) recovered the gun, ammunition, and drugs during a search incident to a lawful arrest. Thus, the district court denied the motion to

11

suppress the evidence seized from Williams and any statements that he made during and after the March 24, 2011 arrest.

### III.  TRIAL, CONVICTION, AND SENTENCING

**A.    Trial**

Jury selection for Williams's trial occurred on July 30, 2012, and the trial itself began the next day, on July 31.  We return to jury selection later in the opinion when we discuss the peremptory strike issue.  We now turn to the evidence presented at trial, as one of Williams's challenges to his convictions is based on sufficiency of the evidence, and another is based on the introduction of evidence at trial which he contends was inadmissible.

During trial, Officers Delgado and Moreno testified for the government.  They described the events as we set forth above.  They also identified and discussed the evidence and statements that were the subject of the pretrial suppression motion.

Specifically, during Officer Delgado's testimony, the government introduced the following items as exhibits: (1) the 2 cigarette boxes that Williams had in his pockets when he was arrested ("exhibit 2"); (2) 4 "baggies of powder cocaine," 21 pink "little baggies" containing "rock" or crack cocaine, and 1 "little baggie of marijuana," all of which Officer Delgado found in Williams's pockets during the search incident to arrest ("exhibit 3"); (3) the currency seized from Williams

12

during the search ("exhibit 4"); and (4) the gun, magazine, and ammunition obtained from Williams during the arrest ("exhibit 5"). Williams made a general objection on Fourth Amendment grounds to the admission of these exhibits, which the district court overruled.

Both officers identified the items as the ones obtained from Williams during the arrest. Specifically, Officer Moreno answered "yes" when asked if he was "a hundred percent certain [that he] saw [the exhibit 5] firearm fall out of [Williams's] waistband."

Additionally, Officer Moreno testified about the post-arrest statements Williams made while in the back of the police car. Williams did not object when Officer Moreno recounted these post-arrest statements.

The government's trial evidence also included expert testimony about the items obtained from Williams. The government tendered Fabrice Nelson, a crime scene investigator with the Miami Police Department, as an expert in crime scene investigation. Investigator Nelson had tested the gun obtained from Williams for fingerprints, finding none. Investigator Nelson testified that the negative result was not unusual, as Glock firearms like Williams's were made to not leave fingerprints.

13

Detective Wayne Tillman of the Miami Police Department also provided expert testimony in the field of street drug dealing.[1]  Detective Tillman's testimony supported the conclusion that the items seized from Williams—the bags of drugs and the pistol—were likely products or tools for street-level drug dealing. Detective Tillman testified that it is common for drug dealers to use distinctive packaging for their drugs, like colored bags.  He also stated that when a drug dealer is "really serious about [his] business," he obtains a weapon, "usually a firearm, a handgun."  Firearms are essential in the drug trade, Detective Tillman testified, because rival drug dealers frequently compete for territory.

Detective Tillman stated that it was unlikely that Williams was just a drug user, based on the items seized from Williams.  He testified: "[a] user is not going to carry around 20 bags.  That user is going to use whatever they purchase as quick as they can."  He also testified that users typically carry with them drug paraphernalia that Williams did not possess, including a crack pipe and a "plunger" to prepare a crack pipe for use.  Moreover, Detective Tillman suggested that a seller often carries cash with him, usually in smaller denomination bills.

Detective Tillman also examined the specific drugs obtained from Williams and concluded that the cocaine was likely the inventory of a drug dealer.  He

---

[1]Williams objected to Detective Tillman's testimony, based on Detective Tillman's qualifications and the alleged prejudicial effect of the testimony.  The district court overruled the objection, and Williams does not raise the issue before this Court.

explained that the fact that the crack and powder cocaine was packaged in different colored bags was telling. The packaging indicated that Williams had been "trying to keep count of which product is which." On the other hand, Detective Tillman testified that the marijuana was probably for Williams's personal consumption.

The government did not call any more witnesses, although the prosecutor did read certain stipulations into the record, and Williams acknowledged that he agreed with the stipulations.[2] After the government rested, Williams made a motion under Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal. He renewed his earlier motion to suppress and argued that the government's evidence otherwise did not establish his guilt. The district court denied the Rule 29 motion. Thereafter, Williams did not personally testify, call witnesses, or offer evidence.

## B.    Verdict

The attorneys then offered closing arguments and the district court charged the jury. That afternoon, the jury returned its verdict, finding Williams guilty of all three counts.

## C.    Sentencing

---

[2]The parties stipulated to the following facts: (1) prior to his March 2011 arrest, Williams was convicted of a felony offense; (2) the firearm and ammunition introduced as exhibit 5 were manufactured outside of Florida and moved in interstate commerce; (3) the drugs in exhibit 3 consisted of less than 28 grams of crack cocaine; and (4) DNA profiles were obtained from the firearm introduced as exhibit 5 and compared to Williams's DNA profile, and the result of this comparison was inconclusive.

At sentencing, the district court imposed concurrent 274-month sentences for counts one and two (the possession of a firearm by a felon and crack cocaine offenses) and a consecutive 60-month sentence for count three (the possession of a firearm in furtherance of a drug trafficking crime offense). Williams's total sentence was 334 months' imprisonment.

Williams timely appealed his convictions.

## IV.  THE SUPPRESSION ISSUE

Williams's first challenge to his convictions is that the district court erred by denying his pretrial suppression motion and then admitting into evidence items obtained from him during the events leading to and following his arrest and his post-arrest statements.[3]  Williams's arguments on this issue are unavailing.

### A.    The District Court's Factual Findings

We first conclude that the district court's findings of fact, made after an evidentiary hearing where the arresting officers and Williams testified, are not clearly erroneous.  Specifically, the district court found that Williams consented to Officer Delgado searching his person.  This finding was supported by the testimony of Officers Delgado and Moreno, which the district court expressly found to be credible.  Although Williams offered contradictory testimony, the

---

[3]A district court's denial of a motion to suppress involves mixed questions of law and fact.  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).  Accordingly, we review de novo the rulings of law, and we review the findings of fact for clear error, in the light most favorable to the prevailing party in the district court.  Id.

16

district court found Williams to be not credible.  Because these findings were not clearly erroneous, we defer to them.

In opposition, Williams challenges the district court's credibility determination.  We have previously observed that "[c]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In fact, in cases like this one, where a district court credited law enforcement officers' testimony over conflicting testimony offered by a defendant, we will defer to the district court's determinations "unless [its] understanding of the facts appears to be unbelievable."  Id. (internal quotation marks omitted).

Here, the district court relied on Officer Delgado's testimony for its finding that Williams consented to a search, and Officer Delgado's testimony was not improbable.  See id.  Moreover, although Officer Moreno could not hear Williams's statements to Officer Delgado, Officer Moreno's testimony supported, and did not contradict, other aspects of Officer Delgado's account.

Furthermore, the district court did not find Williams's testimony to be not credible simply because it was uncorroborated.  See Gallego v. United States, 174 F.3d 1196, 1198 (11th Cir. 1999) (district court erred by discrediting testimony of defendant in § 2255 proceeding because testimony was uncorroborated without

17

other reasons for discrediting testimony, such as internal consistent of testimony or defendant's candor or demeanor on witness stand). Rather, the district court gave specific reasons for discrediting Williams, including, inter alia, that Williams: (1) only contradicted Officer Delgado by making statements that were "entirely self-serving and illogical"; (2) had been convicted of nine felonies, suggesting that he was "less than adept in wielding his constitutional rights to effectively avoid police detection"; and (3) had refused to concede other facts about which there was compelling evidence, such as that he had fought with the officers, or that he had had a gun on his person.

In light of these specific reasons for discrediting Williams's testimony, and the cogent, logical, and supported testimony of Officers Delgado and Moreno, we conclude that the district court's credibility finding was not clearly erroneous. We defer to it. Thus, we accept the district court's finding that Williams's consented to a search.

**B.    Fourth Amendment Analysis**

In light of Williams's consent to search, we conclude that his Fourth Amendment rights were not violated at any point during the events leading up to and following his arrest.

First, Officer Delgado acted lawfully when he knocked on the door of the rooming house on Grand Avenue and engaged Williams in conversation. As this

18

Court has explained, "[t]he Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006). Officer Delgado performed such a "knock and talk" in this case. He and Officer Moreno learned of criminal activity occurring at the rooming house. To investigate these reports, the officers went to the rooming house. There, Officer Delgado knocked on the front door and asked the occupant of the house questions. These actions were for "legitimate police purposes unconnected with a search of the [rooming house]." See id.

Next, as just discussed, Officer Delgado obtained Williams's consent before attempting to search Williams's person. Accordingly, no Fourth Amendment violation occurred when Officer Delgado reached for Williams's waist. See United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) ("It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search an individual without a warrant so long as they first obtain voluntary consent of the individual in question.").

Nor was the Fourth Amendment violated when Officers Delgado and Moreno pursued Williams into the rooming house and attempted to subdue him.[4] Williams's striking of Officer Delgado gave the law enforcement officers probable cause to arrest him for the state offenses of resisting arrest with violence or battery of a law enforcement officer. See State v. Green, 721 So. 2d 1258, 1259 (Fla. 5th DCA 1998); see also Fla. Stat. §§ 784.03(1)(a); 784.07(2)(b) (defining elements of misdemeanor simple battery, which is a third-degree felony when committed on a law enforcement officer). Because the officers had probable cause to arrest Williams, they were entitled to pursue him into the rooming house. We have previously recognized that law enforcement officers may enter a dwelling without a search warrant when they do so while in "hot pursuit" of a suspect. See United States v. Milan-Rodriguez, 759 F.2d 1558, 1564 (11th Cir. 1985).

We conclude our Fourth Amendment analysis by holding that the search of Williams's person resulting in the officers' discovery of the drugs and currency was a permissible search incident to a lawful arrest. As noted, the officers had probable cause to arrest Williams for state offenses based on his striking of Officer Delgado. This probable cause remained at the time when the officers were finally able to subdue Williams and arrest him. Only after arresting Williams did Officer

---

[4]Williams argues that, assuming that he consented to a search, he subsequently revoked that consent by striking Officer Delgado. Whether this action constituted a revocation of consent is irrelevant. After Williams struck Officer Delgado, the officers had probable cause to arrest Williams—thus, they no longer needed Williams's consent to search him.

Delgado search Williams's person.  Because Officer Delgado's search was incident to a lawful arrest, the Fourth Amendment was not violated.  See United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002) ("Since the custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment, a search incident to the arrest requires no additional justification.").

Therefore, because the district court made a proper credibility finding, and completed a sound Fourth Amendment analysis in light of the facts that it reasonably found, the district court did not err by denying the suppression motion. We reject this basis for vacating Williams's convictions.

## V.  THE SUFFICIENCY OF THE EVIDENCE ISSUE

Next, Williams contends that his conviction on count three for possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and his consecutive 60-month sentence for that offense, should be vacated.[5]  Williams argues that there was insufficient evidence to link the gun obtained from him with a drug trafficking crime.[6]  This argument lacks merit.

To prove the count three offense, the government needed to establish that Williams: "(1) knowingly (2) possessed a firearm (3) in furtherance of any drug

---

[5]The standard of review for a sufficiency of the evidence challenge is de novo.  United States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001).  However, we view the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility determinations in the government's favor.  Id.

[6]On appeal, Williams apparently abandons the argument that there was insufficient evidence that he possessed a gun at all.

21

trafficking crime for which he could be prosecuted in a court of the United States."
United States v. Woodard, 531 F.3d 1352, 1362 (11th Cir. 2008) (footnote
omitted).  A firearm is possessed "in furtherance of" a drug trafficking crime when
"the firearm helped, furthered, promoted, or advanced the drug trafficking."  Id.
(internal quotation marks omitted).  Importantly, "the presence of a gun within the
defendant's dominion and control during a drug trafficking offense is not sufficient
by itself to sustain a § 924(c) conviction."  United States v. Timmons, 283 F.3d
1246, 1253 (11th Cir. 2002).

Factors relevant to determining whether the government established the "in
furtherance of" element include: (1) "[t]he type of drug activity that is being
conducted"; (2) "accessibility of the firearm"; (3) "the type of the weapon"; (4)
"whether the weapon is stolen"; (5) "the status of the possession (legitimate or
illegal)"; (6) "whether the gun is loaded"; (7) "proximity to the drugs or drug
profits"; and (8) "the time and circumstances under which the gun is found."
Woodard, 531 F.3d at 1362 (internal quotation marks omitted).

In light of these factors, there was more than enough evidence for a
reasonable jury to conclude that Williams used the pistol in furtherance of a drug
trafficking crime.  Detective Tillman testified that the drugs obtained from
Williams made it likely that Williams was a street-level drug dealer.  He also
testified that street-level drug dealers use handguns like the Glock that fell out of

22

Williams's pants to defend their territories from rival drug dealers.  Additionally, the firearm was loaded, its location in Williams's waistband was easily accessible to Williams, it was located in close proximity to the drugs and the drug dealing profits, and it was found at a time when Williams did not expect to be confronted by law enforcement officers.

In short, the jury had ample evidence to distinguish Williams's possession of the Glock handgun from "innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard."  See Timmons, 283 F.3d at 1253 (internal quotation marks omitted).  Thus, Williams's challenge to the sufficiency of the evidence on count three is without merit.

## VI.  THE PEREMPTORY STRIKE ISSUE

We now turn to Williams's argument that the district court erred by sustaining the government's Batson objection to Williams's peremptory strike of one prospective juror.  We briefly describe the peremptory strike at issue.  We then explain why any error by the district court in applying Batson was harmless and does not entitle Williams to relief.

## A.    Jury Selection in Williams's Trial

During jury selection, Williams, who is black, attempted to exercise one of his ten peremptory strikes on a white venire member, Mr. McCarthy.  At the same time that Williams attempted to strike Mr. McCarthy, he also exercised peremptory

23

challenges as to three other white or Hispanic venire members. During an earlier phase of jury selection, Williams had exercised peremptory challenges to remove five other white or Hispanic venire members.

At that point, the government made a <u>Batson</u> objection to Williams's strike of Mr. McCarthy and the other three venire members, arguing that Williams was exercising his strikes in a way that discriminated against white or Hispanic prospective jurors.[7] The district court prompted Williams's attorney for race-neutral explanations for each of the four objected-to strikes.

When he came to the strike of Mr. McCarthy, Williams's attorney stated: "as to Mr. McCarthy is an Air Force Reserve officer who is also a victim of a crime and we feel that's sufficient, air force reserve officer." The district court asked whether the fact that a prospective juror "is in the military is a reason to . . . excuse him?" Williams's attorney agreed that military service is not a valid reason for exercising a peremptory strike. However, Williams's attorney offered other reasons for striking Mr. McCarthy, stating:

> Well, your Honor, his family are in law enforcement. A brother-in-law is a fire fighter, his uncle is in the Navy, he is in the armed forces. These are all government jobs, government positions, that in this case one of the issues is we are saying that the government was wrong, they did some bad things, and they are not necessarily credible. His

---

[7]The government made a similar <u>Batson</u> objection to Williams's first round of peremptory strikes, which the district court overruled after Williams's attorney offered race-neutral explanations for each strike.

car was stolen and house robbed as well. I think when you put all of those together it is sufficient to overcome a <u>Batson</u> challenge.

After Williams's attorney finished offering race-neutral explanations for his second round of peremptory strikes, without hearing from the government, the district court stated: "All right. I will overrule the <u>Batson</u> challenges except as to Mr. McCarthy . . . . I will sustain the <u>Batson</u> challenge as to Mr. McCarthy."

The district court then completed jury selection and Mr. McCarthy sat on the jury.

## B.    Analysis of the Peremptory Strike Issue

Williams asks this Court to reverse his convictions on the basis that the district court misapplied <u>Batson</u> and its progeny by sustaining the government's <u>Batson</u> objection and seating Mr. McCarthy as a juror. We need not decide whether the district court erred. Even assuming that the district court did misapply <u>Batson</u>, Supreme Court precedent makes clear that such an error does not require reversal.[8]

In <u>Rivera v. Illinois</u>, 556 U.S. 148, 129 S. Ct. 1446 (2009), the Supreme Court held that a state court's erroneous denial of a preemptory strike did not amount to a deprivation of a defendant's Fourteenth Amendment due process right and was thus subject to harmless error review. <u>Id.</u> at 152, 129 S. Ct. at 1450.

---

[8]In light of the concurrence, let us be clear that we offer no opinion as to whether there was or was not error. We hold only that, even if there was error, that error does not automatically require reversing Williams's convictions on appeal.

25

During jury selection before his first-degree murder trial, the Hispanic defendant, Rivera, attempted to use his fourth peremptory strike to remove a black female prospective juror (Ms. Gomez). Id. at 153, 129 S. Ct. at 1451. Rivera had already used two peremptory strikes to remove women, and one of the removed women was also black. Id. The state trial court sua sponte raised Batson and required the defense attorney to offer a race- or gender-neutral explanation for the strike. Id. at 153–54, 129 S. Ct. 1451.[9] The defense attorney stated that he had attempted to strike Ms. Gomez because she: (1) worked at a hospital where she "saw victims of violent crime on a daily basis"; and (2) had "'some kind of Hispanic connection given her name'" although, as the state trial court observed, she was a black female. Id. at 153, 129 S. Ct. at 1451. After affording the defense attorney an opportunity to ask Ms. Gomez more questions about her work at the hospital, the state trial court denied the peremptory challenge and Ms. Gomez sat as the jury's foreperson. Id. at 154, 129 S. Ct. at 1451.

After the jury found Rivera guilty of first-degree murder, he appealed his conviction, arguing that the state trial court had misapplied Batson. The state supreme court determined that the state trial court had erred by sua sponte raising Batson because the record "fail[ed] to support a prima facie case of discrimination of any kind." Id. at 154–55, 129 S. Ct. at 1452 (internal quotation marks omitted)

---

[9]The state trial court did not specify at that time what type of discrimination it suspected the defense attorney of engaging in. Rivera, 556 U.S. at 153, 129 S. Ct. at 1451.

(emphasis omitted).  Nevertheless, the state supreme court determined that the erroneous application of Batson was harmless beyond a reasonable doubt, in light of the overwhelming evidence of guilt presented at trial.  Id. at 155–56, 129 S. Ct. at 1452.

The United States Supreme Court affirmed.  Accepting the state supreme court's determination that the state trial court had erroneously applied Batson, the Supreme Court held that "there is no freestanding constitutional right to peremptory challenges."  Id. at 157, 129 S. Ct. at 1453.  Because a state can grant or withhold peremptory challenges, "the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution."  Id. at 158, 129 S. Ct. at 1454.  The Supreme Court emphasized that Ms. Gomez was not removable for cause, therefore "Rivera's jury was impartial for Sixth Amendment purposes."  Id. at 159, 129 S. Ct. at 1454.

The Court also distinguished the deprivation of a state-provided peremptory challenge, which was all that occurred in Rivera's case, from other "structural errors" requiring "automatic reversal."  Id. at 160–61, 129 S. Ct. at 1455 (internal quotation marks omitted).  Automatic reversal is appropriate when an error resulted in a deprivation of a constitutional right or where a court lacked jurisdiction—neither of which occurred when the state trial court erroneously

27

applied <u>Batson</u> and denied Rivera a peremptory strike.  <u>Id.</u> at 161–62, 129 S. Ct. at 1455–56.

Rivera controls our analysis in this case.  Of course, <u>Rivera</u> involved the denial of a state-created right to peremptory challenges, whereas, in this case, assuming <u>Batson</u> error, the district court deprived Williams of a right to peremptory challenges created by the Federal Rules of Criminal Procedure.  <u>See</u> Fed. R. Crim. P. 24(b)(2) (in non-capital felony cases "[t]he government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges").  This distinction does not mandate a different analysis here than the Supreme Court's <u>Rivera</u> analysis.

Importantly, neither federal nor state defendants enjoy any right under the Federal Constitution to peremptory challenges.  <u>See</u> <u>Rivera</u>, 556 U.S. at 157–58, 129 S. Ct. at 1453–54; <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 311, 120 S. Ct. 774, 779 (2000) ("[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension.").  Thus, the right that Williams asserts arises only under the Federal Rules, just as the right that Rivera asserted arose only under state law.  There is nothing in <u>Rivera</u> suggesting that a deprivation of a state law right to peremptory challenges is subject to harmless error analysis, whereas a deprivation of an

28

analogous federal law right to peremptory challenges is structural error warranting automatic reversal.

In fact, this Court has previously observed that "[t]here is no separate category of structural error apart from constitutional error." United States v. Sanchez, 269 F.3d 1250, 1272 n.41 (11th Cir. 2001) (en banc), abrogated in part on other grounds by United States v. Duncan, 400 F.3d 1297, 1308 (11th Cir. 2005); see also Ross v. United States, 289 F.3d 677, 681 (11th Cir. 2002) ("Structural error, to which harmless error analysis does not apply, occurs only with extreme deprivations of constitutional rights, such as denial of counsel, denial of self representation at trial, and denial of a public trial." (emphasis added) (internal quotation marks omitted)).

Moreover, we have reviewed for harmless error district courts' erroneous deprivations of other rights that exist only under the Federal Rules of Criminal Procedure. See United States v. Parrish, 427 F.3d 1345, 1346–47 (11th Cir. 2005) (reviewing for harmless error district court's denial of defendant's right to be present at sentencing pursuant to Rule 43(a)(3)); United States v. Hersh, 297 F.3d 1233, 1242 n.14 (11th Cir. 2002) (reviewing for harmless error district court's denial of a motion to sever under Rule 14); United States v. Mers, 701 F.2d 1321, 1324–26 (11th Cir. 1983) (reviewing for harmless error district court's failure to

specifically advise co-defendants of their right to separate representation as required by Rule 44(c)).

We acknowledge that in two cases, this Court has determined that a deprivation of a statutory right was structural error warranting automatic reversal. See McGriff v. Dep't of Corr., 338 F.3d 1231, 1235 (11th Cir. 2003) (district court's failure to appoint counsel for § 2254 petitioner as required by Rule 8(c) of the Rules Governing Section 2254 Cases was structural error); Shepherd v. United States, 253 F.3d 585, 587–88 (11th Cir. 2001) (district court's failure to appoint counsel for § 2255 movant as required by Rule 8(c) of the Rules Governing Section 2255 Proceedings was not subject to harmless error analysis). However, those cases both involved deprivations of statutory rights to counsel. To the extent that they created exceptions to the general principle that only deprivations of constitutional rights lead to structural errors, those exceptions are not at issue in this case.

Although Rivera and this Court's precedent alone dictate that we review for harmless error a district court's failure afford a defendant the peremptory challenges required by Rule 24, we note that other Circuits have explicitly reached this conclusion. See United States v. Lindsey, 634 F.3d 541, 548–49 (9th Cir. 2011); United States v. Gonzalez-Melendez, 594 F.3d 28, 33 (1st Cir. 2010). In Lindsey, the Ninth Circuit explained that Rivera was applicable to Rule 24 errors

30

and that <u>Rivera</u> overruled that circuit's precedent establishing that a denial of a peremptory challenge was a structural error subject to automatic reversal. 634 F.3d at 550. That Court stated: "<u>Rivera</u>'s reasoning is not unique to the state court system, nor does its holding suggest that the Supreme Court would come to a different conclusion regarding the federal system . . . . <u>Rivera</u>'s reasoning in the state court context applies to this federal case." <u>Id.</u>

We agree with the Ninth Circuit and hold that <u>Rivera</u> controls our analysis here. We assume without deciding that the district court misapplied <u>Batson</u> and denied Williams the benefit of one of the peremptory strikes to which he was entitled under Rule 24. We thus apply harmless error review to any misapplication of <u>Batson</u> that results in the seating of a juror who is otherwise qualified for juror service. "In cases of nonconstitutional error in criminal cases, we apply the federal harmless-error statute, which provides that on appeal we must ignore 'errors or defects which do not affect the substantial rights of the parties.'" <u>United States v. Guzman</u>, 167 F.3d 1350, 1353 (11th Cir. 1999) (quoting 28 U.S.C. § 2111); <u>see also</u> Fed. R. Crim. P. 52(a); <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946). Under this standard, the government bears the burden of showing that the error did not affect the defendant's substantial rights. <u>See United States v. Fern</u>, 155 F.3d 1318, 1327 (11th Cir. 1998); <u>see also United States v.</u>

Mathenia, 409 F.3d 1289, 1291–92 (11th Cir. 2005) (discussing differences between constitutional and nonconstitutional harmless error standards).

Williams does not argue, and nothing in the record indicates, that Williams's substantial rights were affected by Mr. McCarthy's jury service.  Rather, Williams contends that automatic reversal is appropriate.[10]  For the reasons we have explained, Williams is wrong.  Accordingly, we conclude that any error by the district court during jury selection was harmless and does not warrant vacating Williams's convictions and sentences.[11]

## VII.  CONCLUSION

For the foregoing reasons, we affirm Williams's convictions and sentences.

---

[10]Williams argues that "[e]rroneous deprivation of a defendant's right of peremptory challenge requires reversal."  For this proposition, he relies primarily on cases from other circuits which came before Rivera.  One of those cases, United States v. Annigoni, 96 F.3d 1132 (9th Cir. 1996) (en banc), the Ninth Circuit expressly held in Lindsey had been overruled by Rivera. Lindsey, 634 F.3d at 548–49.

The one case that Williams cites from this Court is not on point.  Williams relies on Davis v. Secretary for Department of Corrections, 341 F.3d 1310 (11th Cir. 2003), where this Court noted, while analyzing a post-conviction claim of ineffective assistance of counsel, that most courts view a trial court's erroneous denial of a Batson objection as a structural error warranting automatic reversal.  Id. at 1316–17.  In Rivera, the Supreme Court agreed with this statement, noting that "the unlawful exclusion of jurors based on race requires reversal."  556 U.S. at 161, 129 S. Ct. at 1455.  However, the Supreme Court also emphasized that excluding prospective jurors in a discriminatory way is wholly different from seating prospective jurors who are indisputably qualified for jury duty, but who a party would prefer do not serve.  Id. at 158–59, 129 S. Ct. at 1454.  The former, which did not occur here, is a structural error warranting automatic reversal; the latter, which did occur in Williams's case, is not a structural error and harmless error review is appropriate.

[11]In holding that any error during jury selection was harmless, we are not equating harmless error review with no review at all.  Instead, we perform a meaningful appellate review and recognize that Williams does not argue, and the record does not support the conclusion, that the error harmed Williams.

**AFFIRMED.**

HINKLE, District Judge, concurring:

I agree with the majority's opinion on the sufficiency-of-the-evidence and suppression issues. On the issue arising under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), I agree with majority's result and with the most important part of its holding: when a district judge erroneously sustains a <u>Batson</u> challenge and thus seats a juror who should not have been seated, the error is not automatically reversible. If the error is harmless, the verdict is valid.

The majority does not decide whether the district judge erroneously sustained the <u>Batson</u> challenge now at issue. The majority decides, without addressing the specifics of this case, that any error was harmless. I would not treat harmlessness as a foregone conclusion. Instead, I would affirm this conviction on a different ground. I would hold that, at least as shown by this record, the district judge did not err in sustaining the <u>Batson</u> challenge.

The defendant's attorney engaged in a clear pattern of peremptorily striking jurors based on race or ethnicity. The goal apparently was to seat as many African American jurors as possible. Conforming to the pattern, the attorney announced a peremptory strike of the white juror now at issue. In response to the <u>Batson</u> challenge, the attorney parceled out several legitimate, nondiscriminatory reasons for striking the juror. But it is not at all clear that the proffered reasons were the real reasons for the strike.

34

The first two proffered reasons were the juror's military service—he was an officer in the Air Force Reserves—and that the juror was a crime victim. When the judge inquired further, the attorney quickly withdrew his reliance on military service, seemingly acknowledging that that was not a real reason for the strike. That the juror was a crime victim also did not explain the strike. Other jurors (in seats 1, 4, 6, and 8) also were crime victims. Those crime victims were not white and were not peremptorily struck. So race or ethnicity could explain the different treatment, while being a crime victim could not.

After reviewing his notes, the attorney added another reason: the juror had family members in law enforcement. That was not true. The juror did have a brother who was a firefighter and an uncle in the Navy. But the attorney had withdrawn his reliance on military service. And the attorney did not strike another juror with three sons who served in the military, at least one of whom was still active. Three sons probably count for more than one uncle. The juror with the three sons was also a crime victim.

The defendant argues with considerable force that there were good grounds to peremptorily strike the juror now at issue. The juror was robbed at gunpoint. One of the charges against the defendant was possessing a gun in furtherance of a drug crime. Even if the other proffered reasons were pretextual, one valid reason is enough. Had the attorney cited this as the reason—or even *a* reason—for the

35

peremptory strike, the district judge might well have upheld it.  But the attorney said only that the juror was a crime victim, not that the juror had been robbed at gunpoint, and the attorney offered other, probably pretextual, explanations.  A district judge presiding over a jury selection cannot reasonably be expected to remember every juror's answer to every question.   An attorney who relies on a fact in opposition to a <u>Batson</u> challenge should explicitly cite it.

The defendant also notes that the district judge did not explicitly make the critical findings—that the proffered reasons were pretextual and the real reason for the peremptory strike was race.  But the judge obviously made these findings, implicitly if not explicitly.  The judge had accurately described the governing law earlier in the process; he overruled a number of <u>Batson</u> challenges; and he explicitly sustained this one.

A district judge should explicitly make the required findings and should explain them to the extent necessary to facilitate appellate review.  But it is entirely understandable—indeed, commendable—that this judge did not take the time to offer a lengthy explanation on the spot.  The judge and attorneys were at sidebar, with a room full of jurors waiting for the selection process to continue.  Wasting jurors' time is inconsistent with good jury-trial management; jurors whose time is respected tend to buy into the process more completely, pay attention more closely, and return more reliable verdicts.  Many district judges defer explanations of

36

significant length to a recess or lunch break or the end of a trial day, thus avoiding a waste of juror time.  And if a judge in the midst of managing a trial fails to return to a Batson issue to make explicit findings or give a full explanation, it is the responsibility of the challenger—the party who will raise the issue on appeal—to get the relevant facts into the record and ask for any necessary explanation.  When the party does not do so, we should give the judge the benefit of the doubt, so long as the record provides reasonable support for the judge's decision.

Based on this record, a district judge could reasonably find that the proffered reasons for striking this juror were pretextual and that the only real reason for the strike was race.  This district judge so found.  The finding was not clearly erroneous.  I would uphold the decision.

The majority does not address this issue.  Instead, the majority concludes, without addressing the specifics of this case, that any error was harmless.  If the majority means to suggest that if a juror cannot properly be struck for cause, seating the juror will always be harmless, I disagree.  Harmless-error review is not no review.

Indeed, if the real reason for the peremptory strike was that this juror was robbed at gunpoint, and if the district judge erred in ruling otherwise, then I am not at all certain that the error was harmless.  Jury selection matters.  Peremptory strikes exist for a reason.  The Supreme Court has properly held that the

37

Constitution does not require a state to grant a new trial when a <u>Batson</u> challenge is improperly sustained, at least in the absence of bad faith.  <u>See</u> <u>Rivera v. Illinois</u>, 556 U.S. 148, 157-58 (2009).  But we impose many standards in federal criminal trials and on appellate review of federal convictions that are not mandated by the Constitution.  Unless we equate harmless-error review with no review, I do not believe the erroneous grant of a <u>Batson</u> challenge should always be deemed harmless.  I would not put such decisions, even when made in good faith, beyond meaningful appellate review.