[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12567
Non-Argument Calendar
_____

D.C. Docket No. 5:14-cr-00042-WTH-PRL-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

COREY JAMAAL WOODARD,
SHAWN LAMONTE ROBINSON,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(November 30, 2016)

Before MARTIN, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

The government alleged that defendants Corey Jamaal Woodard and Shawn Lamonte Robinson participated in a cocaine trafficking conspiracy over the course of seven years. After a jury trial, the defendants appeal their convictions and sentences for conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and aiding and abetting the attempted possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B), (b)(2). Additionally, Woodard appeals his conviction and sentence for knowingly possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).

The defendants mount a number of challenges to their convictions and sentences. After careful consideration, we find no reversible error and therefore affirm.

Robinson first challenges the district court's denial of his motion to suppress evidence stemming from a search of his residence. But we conclude that the warrant authorizing this search was based on sufficient probable cause. Second, he challenges the sufficiency of the evidence underlying both of his convictions. The evidence was sufficient to support his convictions, however: it was extensive and the jury could reasonably have believed the government's witnesses. Third, Robinson challenges the district court's refusal to give his requested jury instruction about the inability of government informants to be co-conspirators.

2

The court gave an alternate instruction, however, which substantially covered what Robinson requested.[1]

Woodard challenges the district court's exclusion of a portion of a prosecution witness's plea agreement under the rule of completeness. This exclusion was proper because the excluded portion did nothing to clarify or contextualize the part that had been admitted. Woodard also challenges the sufficiency of the evidence underlying his firearms conviction. But witness testimony, along with the proximity of the firearms to Woodard and drug purchase money, was sufficient to support his conviction.

Given the number of issues in this appeal, we discuss each issue separately below and set forth its relevant facts in the context of that discussion. We first address Robinson's appeal of the denial of his motion to suppress the evidence seized from his residence. Next, we address Woodard's challenge to the district court's evidentiary ruling denying admission of the factual basis of a government cooperator's plea agreement. We then address both defendants' challenges to the

---

[1] Additionally, both Woodard and Robinson argue that the district court's factual findings about the quantity of cocaine involved in their scheme violated the Sixth Amendment under *Alleyne v. United States*, 133 S. Ct. 2151(2013). This argument is foreclosed by our decision in *United States v. Charles*, 757 F.3d 1222 (11th Cir. 2014), which held that "a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or minimum authorized by facts determined in a guilty plea or jury verdict." *Id.* at 1225. As in *Charles*, here, "[b]ecause the . . . increase here affected only [the defendants'] guidelines calculation and not [their] statutory mandatory minimum or maximum, [their] reliance on *Alleyne* is misplaced." *Id.* at 1225–26.

3

sufficiency of the evidence to support their convictions.  Finally, we address Robinson's appeal of the district court's refusal to give Robinson's requested jury instruction on the inability of government cooperators to be co-conspirators.

## I.    The Search Warrant and Motion to Suppress

Robinson challenges the district court's refusal to suppress evidence seized from his house by Drug Enforcement Administration ("DEA") agents acting pursuant to a search warrant.  He argues that the affidavit supporting this warrant did not provide probable cause for a search because it included information from two unreliable sources:  a cooperating defendant ("CD") and an anonymous source of information ("SOI").  Probable cause depended on information from these sources.  But this information was sufficiently reliable because the DEA independently was able to corroborate much of it, and the sources corroborated each other.  Robinson also argues that the affidavit established no nexus between his residence and criminal activity.  But both informants tied his residence to drug trafficking.  The district court's denial of Robinson's motion to suppress was therefore proper.

## A.    The Search Warrant Affidavit

DEA Agent Paul Smith's affidavit included information from three sources: the CD, the SOI, and his investigation.  The CD provided information about Robinson's drug trading activities.  He also recorded phone calls with Robinson

4

and set up a fake drug transaction at the DEA's behest. The SOI provided further information about Robinson's activities and confirmed the CD's information. Based on the similarity of the information provided by the two informants and his own investigation, Smith deemed both informants' information to be reliable. All the information that follows comes from the affidavit.

The CD had known and conducted cocaine transactions with Woodard and Robinson for more than seven years. These transactions typically involved several kilograms of cocaine at a time. During these transactions, Woodard usually would travel from Orlando to Ocala with money to purchase the cocaine and provide the money to the CD. The CD would use the money to purchase cocaine from his source, which he then provided to Woodard.

According to the affidavit, when Woodard occasionally was unavailable, the CD traveled to Robinson's residence to pick up the money for purchasing cocaine from his source in Ocala. When the CD's source ran dry, he many times had purchased small amounts of cocaine from Robinson at Robinson's residence. The CD told investigators that Robinson maintained storage units near Robinson's residence containing drug money and narcotics. When the CD visited Robinson's residence, Robinson always had a loaded pistol in sight and typically a small amount of marijuana as well.

5

The affidavit further detailed that with the CD's permission, the DEA began recording his phone calls with Woodard and Robinson.  At the DEA's prompting, the CD led Robinson to believe that the CD had developed a new source of cocaine in Ocala.  Eventually, the CD agreed to sell Robinson two kilograms of cocaine for $35,000 per kilogram.  They agreed that Woodard would travel to the CD in Ocala with the money and then return to Orlando with the drugs.

The affidavit related that on June 19, 2014 DEA agents surveilled Robinson's and Woodard's residences in anticipation of the agreed-upon transaction taking place.  They observed Woodard travelling to Robinson's residence and then departing.  Smith, the affiant, believed Woodard had obtained the money for the transaction from Robinson at his residence and was headed to Ocala to complete the transaction.  Smith communicated with agents observing the northbound Florida turnpike; he described the make and model of Woodard's vehicle.  These agents observed Woodard driving north about an hour later, stopped his vehicle, and seized approximately $70,000 and three loaded handguns from the vehicle.[2]

The SOI confirmed much of the CD's information.  She accurately related the events of June 19 as well as Robinson's birthdate, his address, and two of his previous phone numbers.  She also told investigators Robinson's daily schedule,

---

[2] Woodard was not arrested, presumably to allow the investigation to continue.

6

that he often had a semi-automatic pistol with him, and that he maintained storage units to house money and weapons. She reported having observed him returning from these units with more than $50,000. According to the SOI, these units originally were in the name of Shuronda Manning, but after the June 19 money seizure, they had been placed under a different name. The DEA confirmed that Shuronda Manning was the mother of Robinson's child. The SOI accurately identified Robinson's Ocala narcotics associate as the CD via an alias and provided the CD's phone number.

The affidavit also described the indictment and arrest of Woodard and Robinson. Robinson was arrested in his residence. During the arrest, agents observed what appeared to be marijuana as well as an empty handgun box containing a handgun magazine. An agent advised Robinson of his *Miranda*[3] rights and then asked Robinson where in his house the gun was located. Robinson refused to answer and invoked his rights to remain silent and to have counsel.

## B.    Robinson's Motion to Suppress

Before trial, Robinson moved to suppress the evidence derived from the search of his house. Robinson challenged the sufficiency of the affidavit to support a search warrant, arguing that it failed to establish the reliability of the CD's and the SOI's information or a sufficient nexus between the drug conspiracy

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

and Robinson's residence.[4]  The magistrate judge issued a Report and Recommendation recommending the motion be denied to which Robinson objected.  The district court adopted the magistrate judge's Report and Recommendation and denied Robinson's motion to suppress.  For the reasons that follow, we find no error.

When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of the law to those facts *de novo*, construing the facts in the light most favorable to the prevailing party below—here, the government.  *United States v. Lewis*, 674 F.3d 1298, 1302–03 (11th Cir. 2012).  "We give great deference to a lower court's determination of probable cause."  *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (internal quotation marks omitted).  A district court's choice between two permissible views of the evidence cannot be clear error.  *See United States v. Smith*, 821 F.3d 1293, 1302 (2016).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

---

[4] Robinson also contended that the search warrant improperly was based on his invocation of his right to counsel and his refusal to consent to a search of his residence. Although the affidavit mentioned these facts, neither the magistrate judge nor the district court relied on them in denying Robinson's motion to suppress.  Indeed, the magistrate judge's Report and Recommendation, which the district court adopted, states that Robinson's refusal to answer questions was not a factor necessary to find probable cause.  Although raised on appeal, this issue lacks merit.

place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause to support a search warrant exists when, under the totality of the circumstances, there is a fair probability of finding contraband or evidence at a particular location. *Brundidge*, 170 F.3d at 1352. "The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). An affidavit in support of the warrant application must contain information giving rise to a fair probability that evidence will be found in the place police seek to search. *Id.* "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id.* If an informant is mentioned in an affidavit, "the affidavit must also demonstrate the informant's veracity and basis of knowledge." *Id.* (internal quotation marks omitted). "However, when there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *Id.* (internal quotation marks and alteration omitted).

The affidavit in this case provided ample independent corroboration for both the CD's and the SOI's reliability. Both the CD and the SOI—corroborating each other's information—had knowledge of Robinson's name, address, telephone number, use of a firearm, and access to storage units nearby containing money

9

from drug sales.  The CD conducted numerous recorded phone calls with Robinson, which confirmed for Smith what the CD told him about Robinson's involvement in cocaine transactions.  The SOI reported the seizure of money and guns from Woodard's car on June 19 that Smith had worked with the CD to arrange.  Smith independently corroborated key parts of the information the CD and SOI provided and determined, based on this corroboration, that their information was reliable.  *See id.* at 1315 ("[W]e recognize[] the significance of the police officers' investigation and corroboration of an informant's tip in determining whether probable cause existed on the basis of an informant's assertions.").

Robinson argues that the affidavit nonetheless was insufficient to support probable cause because its concession that no illegal activity had been observed at Robinson's residence negated the required nexus between the home and illegal activity.[5]  He is incorrect.  The CD reported buying cocaine from and selling it to Robinson at Robinson's residence, as well as retrieving money from Robinson there to use in purchasing drugs in Ocala.  The DEA also observed Woodard at Robinson's residence about an hour before approximately $70,000 was found in Woodard's vehicle on the day that—according to the CD's telephone calls—

_____

[5] Robinson does not argue that the affidavit failed to establish a sufficient nexus between himself and his residence, only that there was no connection between his residence and illegal activity.

10

Woodard planned to purchase cocaine for Robinson in Ocala. During the course of their arrest of Robinson at his residence, law enforcement observed what they believed to be marijuana, as well as an empty handgun box and magazine, in plain view inside the residence. These facts established a connection between Robinson's residence and unlawful drug distribution sufficient to provide probable cause for a search warrant.

For these reasons, we conclude that the district court correctly denied Robinson's motion to suppress.

## II.    Woodard's Evidentiary Challenge

Woodard challenges under Federal Rule of Evidence 106 the district court's refusal to admit a portion of a cooperator's plea agreement. This cooperator, Josias Reyes, testified for the government, and the district court admitted the terms of his plea agreement on the government's motion. But the portion of the plea agreement admitted did not include the factual basis for Reyes's plea. Woodard argues that this factual basis should have been admitted under Rule 106, the so-called "rule of completeness." He is mistaken. The factual basis was not necessary to avoid confusion or place the plea agreement in context. The district court's exclusion of the factual basis was therefore proper.

Reyes, a cocaine distributor cooperating with the government, testified at trial about his relationship with Woodard. On cross-examination, Woodard's

11

counsel inquired about Reyes's plea agreement. Defense counsel elicited testimony that Woodard was not mentioned anywhere in the plea agreement or the factual basis Reyes signed as part of that agreement. On redirect, the government moved to admit into evidence a portion of Reyes's plea agreement detailing his agreement to cooperate. Woodard objected under the rule of completeness that the partial document being introduced lacked the factual basis portion of the plea agreement. The district court overruled the objection, explaining that it could be misleading to the jury to suggest the testimony at trial was different than what was written in the factual basis. Reyes then testified that he understood, per the agreement, that he would face consequences if he falsely implicated another person.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005). Under Rule 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 "does not automatically make the entire document admissible" just because part of that document is admitted. *United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (internal quotation marks omitted). "Rather, it is consistently held that the rule permits introduction only of additional material that is relevant and is

12

necessary to qualify, explain, or place into context the portion already introduced." *Id.* (internal quotation marks and alteration omitted).

Woodard argues that the plea agreement's factual basis should have been admitted to provide "context" to the remainder of the agreement. We disagree. The government sought to admit the plea agreement to demonstrate the consequences Reyes would face for falsely accusing somebody of a crime. The factual basis portion of the plea agreement would not have contextualized "the portion already introduced"—here, the terms of the plea agreement. *Id.* Woodard's argument essentially concedes this point: he sought to admit the factual basis of the plea agreement to impeach the substance of Reyes's testimony, not to clarify the terms of the plea deal. Thus, by his own argument Woodard was not entitled to introduction of the factual basis pursuant to Rule 106.

Woodard cites in support of his argument *United States v. Lopez-Medina*, 596 F.3d 716 (10th Cir. 2010), in which the Tenth Circuit held the factual basis of a plea agreement admissible under Rule 106. *Id.* at 735. But that case is inapposite. There, the defendant introduced a co-defendant's plea agreement to suggest to the jury that the co-defendant had accepted sole responsibility for the entire crime. *Id.* The court admitted the factual basis of that agreement under Rule 106 because the factual basis clarified that the co-defendant had not accepted sole responsibility for the crime. *Id.* There, the factual basis was necessary to avoid

13

misleading the jury about the true meaning of the plea agreement. In this case, by contrast, there was no chance Reyes's plea agreement would be similarly misleading without admitting its factual basis, so the district court did not abuse its discretion in excluding it.

### III.    Sufficiency of the Evidence

Robinson and Woodard were each convicted of multiple crimes. Both were convicted of conspiracy to distribute cocaine for the seven years of cocaine trafficking that the government was able to catalog at trial through the testimony of other drug traffickers. Robinson challenges the sufficiency of the evidence underlying the conspiracy conviction. Both Robinson and Woodard were also convicted of aiding and abetting the attempted possession of cocaine with intent to distribute. These convictions centered on the fake cocaine transaction that the government arranged to take place on June 19, 2014. Robinson also challenges the sufficiency of the evidence underlying his attempted possession conviction. Woodard alone was convicted of possessing a firearm in furtherance of drug trafficking. This charge, too, related to the events of June 19. Woodard challenges the sufficiency of the evidence on this conviction.

We review the district court's denial of a motion for judgment of acquittal *de novo*; however, we note that "[e]vidence is sufficient to support a conviction where after viewing the evidence in the light most favorable to the prosecution, any

14

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Miranda*, 666 F.3d 1280, 1282 (11th Cir. 2012) (internal quotation marks omitted). "[W]e assume that the jury made all credibility choices in support of the verdict." *United States v. Jiminez*, 564 F.3d 1280, 1285 (11th Cir. 2009).

At trial, the government introduced testimony from more than a dozen witnesses. We discuss here only the testimony relevant to the issues on appeal. For ease of discussion, we break the evidence down into a different section for each sufficiency challenge.

## A.    Robinson's Conspiracy to Distribute Cocaine Conviction

Robinson challenges the sufficiency of the evidence underlying his conviction for conspiracy to distribute cocaine. He argues that Tim Munnerlyn and George Evans—drug traffickers who testified about his involvement in the conspiracy—were not credible. But credibility determinations are for the jury, and here the jury apparently believed Munnerlyn and Evans. Robinson also argues that without their testimony, there was no direct evidence linking him to drug trafficking. But the government need not prove conspiracy by direct evidence. And in any event, there was ample evidence beyond Munnerlyn's and Evans's testimony supporting Robinson's conspiracy conviction. The evidence underlying Robinson's conspiracy conviction was therefore sufficient.

15

### 1.    The Conspiracy

At trial, the government adduced evidence of a drug trafficking ring going back at least seven years.  Robinson—usually acting through his colleague Woodard—acted as both a purchaser and a distributor during this time.  The government's most important witness was Evans, the aforementioned CD, who cooperated with the DEA.  Munnerlyn, a cocaine distributor cooperating with the government, also testified about his relationship with Woodard and Robinson, which, over time, led to drug transactions.

Evans testified about his drug transactions with both defendants, whom he identified in court.  Evans, a convicted felon, admitted he hoped for a reduced sentence based on his cooperation.  He testified that he met Woodard and sold him cocaine at a house in Ocala.  He later met Robinson through cocaine deals with Woodard.  Evans testified that although Robinson never came to the house in Ocala for cocaine deals, the two did meet to straighten things out after a man working with Robinson gave Evans $5,000 in counterfeit money.  When they bought cocaine from him, Evans testified that Woodard and Robinson purchased three to four kilograms at a time.

Evans testified that eventually he and the defendants swapped roles, and he began buying cocaine from Woodard and Robinson.  He explained that the pair would "front" him—that is, give him on consignment—cocaine at $1,100 to

16

$1,200 an ounce. Evans would drive from Ocala to Orlando to pick up the cocaine, first at Woodard's house then, as time went on, at Robinson's.

Munnerlyn also identified Woodard and Robinson in court and explained that he had been introduced to Woodard by another drug trafficking associate. Over time, he built a relationship with Woodard and, later, with Robinson. Typically, Munnerlyn would contact one of his cocaine sources and facilitate a sale from that source to Woodard. Eventually, Munnerlyn began to sell cocaine directly to Woodard. As time went on, the size of these transactions got larger—up to 10 kilograms at a time. Robinson was not present at these transactions, but Munnerlyn testified that Woodard would call Robinson when there was a problem—specifically the several times the cocaine did not weigh as much as it should have. And Munnerlyn reported meeting with Robinson on one occasion to discuss "straightening out" a watered down kilogram of cocaine that Munnerlyn had purchased from a supplier. Eventually, Munnerlyn began to travel to Woodard's house to purchase cocaine from him and Robinson rather than sell it to them.

### 2.    Robinson's Conspiracy Sufficiency Challenge

"To sustain a conviction for conspiracy to distribute [cocaine] in violation of 21 U.S.C. § 846, the government must prove that 1) an agreement existed between two or more people to distribute drugs, 2) that the defendant knew of the

17

conspiratorial goal, and 3) that he knowingly joined or participated in the illegal venture." *United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) (internal quotation marks omitted). "In assessing whether the record is sufficient to sustain a conviction, we consider whether a common goal existed, the nature of the underlying scheme, and the overlap of participants." *Id.* Circumstantial evidence can be used to prove conspiracy, and "repeated transactions between participants buying and selling large quantities of illegal drugs" may be sufficient to find the participants were involved in a single conspiracy to distribute those drugs. *Id.* Moreover, even if a defendant did not know all the details of a conspiracy, participate in every stage thereof, or have direct contact with each of the other co-conspirators, he can still be convicted if he was aware of the conspiracy's essential nature. *Id.* at 497–98. The record here is sufficient to sustain Robinson's conspiracy conviction.

First, the evidence at trial demonstrated an agreement between Robinson and others to distribute cocaine. Munnerlyn and Evans both testified to selling cocaine to and buying cocaine from Robinson over the course of years. Both also testified to Robinson's longtime use of Woodard as a go-between when buying and selling cocaine. Each of these relationships alone—Robinson-Munnerlyn, Robinson-Evans, and Robinson-Woodard—demonstrated Robinson's agreement with others

18

to distribute cocaine. Together, they are more than sufficient proof to sustain his conviction.

Second, the evidence proves Robinson's knowledge that he, Munnerlyn, Evans, and Woodard were distributing cocaine. Evans testified to purchasing cocaine directly from Robinson at his residence. Munnerlyn testified to meeting with Robinson to discuss straightening out a transaction between them involving watered-down cocaine. This testimony established that Robinson must have known his compatriots were involved in distributing cocaine.

Third, the evidence sufficed to show that Robinson knowingly participated in the cocaine distribution scheme. Indeed, the evidence suggested that he hatched the scheme in the first place. Both Munnerlyn and Evans testified that Woodard called in Robinson when things went wrong. Both also testified that Robinson directed Woodard's actions. This testimony supported the inference that Robinson was in charge of the conspiracy—at least vis-à-vis Woodard—so it certainly supports his knowing participation therein.

Robinson contends the evidence was insufficient to support his conviction for two interrelated reasons. First, he argues that Munnerlyn and Evans, who testified about his involvement in the conspiracy, were not credible because they were "career offenders and professional drug traffickers." Robinson's Br. at 21. Second, Robinson asserts that, without the testimony of Evans and Munnerlyn,

19

there was no direct evidence linking him to the conspiracy.  Robinson's challenges lack merit.

With respect to Robinson's first argument, it is well established that "credibility determinations are the exclusive province of the jury" and "a judgment of acquittal is not required because the government's case includes testimony by an array of scoundrels, liars, and brigands." *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (internal quotation marks alteration omitted).  "By bringing back a verdict of guilty, . . . the jury found that the testimony . . . was credible." *Id.* (internal quotation marks omitted).  Such credibility determinations will only be disturbed on appeal if the testimony in question was "incredible as a matter of law," meaning "it relates to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (internal quotation marks omitted).  Robinson does not argue that Munnerlyn's and Evans's testimony was incredible as a matter of law.  We therefore will not disturb the jury's credibility determinations.

As to Robinson's second argument, he may be right that the government adduced no direct evidence linking him to the conspiracy except the testimony of Evans and Munnerlyn.  But the government did not have to do so.  As explained above, there is no reason to discount Evans's and Munnerlyn's testimony when the

20

jury apparently credited it.  And there is no need for direct evidence when binding precedent tells us that circumstantial evidence will do.  *See, e.g.*, *Reeves*, 742 F.3d at 497 ("It is by now axiomatic that participation in a criminal conspiracy need not be proved by direct evidence." (internal quotation marks and alteration omitted)).  The evidence was therefore sufficient to sustain Robinson's conspiracy conviction.

**B.    Robinson's Aiding and Abetting the Attempted Possession of Cocaine with Intent to Distribute Conviction**

Robinson also challenges the sufficiency of the evidence underlying his conviction for aiding and abetting attempted possession of cocaine with intent to distribute.  He argues that without Evans's testimony, there was nothing linking him to attempted possession of cocaine.  He further argues that Woodard's unimpeached testimony established that they planned to purchase marijuana, not cocaine, on June 19.  These arguments fail.  The jury was free to credit Evans's and Munnerlyn's testimony over Woodard's.  The evidence underlying Robinson's aiding and abetting attempted possession charge was therefore sufficient.

**1.    The June 19 Transaction**

As part of his cooperation with the government, Evans made phone calls and had conversations with Woodard and Robinson.  At the government's behest, he used these calls to arrange a fake cocaine transaction on June 19, 2014.  The DEA recorded the phone calls leading to the transaction, and these recordings along with a transcript were admitted into evidence.  Evans explained that conversations in the

21

drug trade are conducted in code to evade detection by law enforcement, and he "translated" the recorded calls from code into plain English. He explained one recorded conversation in which he informed Robinson that he had cocaine available and Robinson stated he was running low. He then explained several more conversations in which the pair negotiated the sale of cocaine. They set a price of $35,500 per kilogram, and Robinson agreed to purchase two kilograms. Though the conversations were in code and the word cocaine was never used, Evans twice made clear to the jury that he and Robinson were talking about cocaine rather than marijuana.

Robinson told Evans that Woodard agreed to make a single round trip from Orlando to Ocala with the money to purchase the cocaine. Evans explained that on the morning of June 19, 2014, he and Robinson re-negotiated to $35,000 per kilogram, for a total of $70,000 for two kilograms. He then got confirmation from Robinson and Woodard that Woodard was headed toward Ocala. Smith testified that when law enforcement pulled Woodard over, they found $69,880 in cash, along with $120 in counterfeit currency, in his car.

After the government rested, Woodard testified in his own defense, denying participation in a conspiracy involving cocaine. Woodard admitted driving toward Ocala on June 19 but testified that he intended to purchase marijuana, not cocaine. When asked about the large amount of money he was transporting, he explained

22

that half of it belonged to a friend.  His half came from an insurance payout for his stolen truck and two payments for a car accident.  On cross-examination, Woodard stated that he intended to become a marijuana dealer, though he had never done it before.

## 2.    Robinson's Attempted Possession Sufficiency Challenge

To sustain a conviction for attempted possession with intent to distribute cocaine, the government must have proven that a defendant "(1) acted with the kind of culpability required to possess cocaine knowingly and willfully and with the intent to distribute it" and "(2) engaged in conduct which constitute[d] a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent." *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001).  To sustain a conviction under an aiding and abetting theory, the government must have proven "that the defendant associated himself with a criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *United States v. Pantoja-Soto*, 739 F.2d 1520, 1525 (11th Cir. 1984).  The evidence indicates that Robinson did all of the above.

Here, the evidence at trial surrounding the June 19 transaction was sufficient to convict Robinson of aiding and abetting the attempted possession of cocaine with intent to distribute.  First, with respect to attempted possession with

intent to distribute, his actions demonstrated his intent.  Over the course of several phone calls, Robinson negotiated with Evans about the quantity, price, and driving arrangements required for Robinson to purchase cocaine from Evans's source. These conversations demonstrated his intention to acquire a large amount of cocaine.  During these conversations, Robinson spoke in code, suggesting that he knew the planned transaction to be illegal.  And he eventually agreed to purchase two kilograms.  The large quantity of cocaine involved suggested a plan to distribute it.  *Cf. United States v. Tinoco*, 304 F.3d 1088, 1123 (11th Cir. 2002) ("A defendant's intent to distribute . . . may be inferred from the large quantity of narcotics that were seized.").  He thus acted with the culpability necessary to knowingly possess and distribute cocaine.

Second, Robinson completed a substantial step toward possessing the cocaine.  The evidence suggests that on June 19 Robinson obtained about $70,000 and gave it to Woodard.   The evidence also indicates that Robinson intended Woodard to drive the money to Ocala and use it to buy two kilograms of cocaine from Evans's source.  Giving Woodard the $70,000 was a substantial step toward possessing cocaine with the intent to distribute it.

This evidence was thus sufficient to prove attempted possession with intent to distribute cocaine:  Robinson intended to possess two kilograms of cocaine, and he gave about $70,000 to an accomplice toward that end.

24

But Robinson was charged under a theory of aiding and abetting.  The evidence was more than sufficient to meet the aiding and abetting elements as well.  First, by communicating with Woodard and arranging for him to purchase cocaine from Evans's source, Robinson associated himself with Woodard's attempted possession of cocaine with intent to distribute.  Second, Robinson arranged the transaction between himself, Woodard, and Evans's source; the evidence suggests that he wished to cause the transaction to occur.  Third, in making those arrangements and in giving Woodard $70,000, Robinson sought to make the scheme succeed.  He thus aided and abetted Woodard's attempted possession of cocaine with intent to distribute.

Robinson challenges the sufficiency of the evidence on the grounds that, aside from Evans's testimony, there was no direct evidence that any transaction involving cocaine was afoot.  By contrast, he argues, Woodard's unimpeached testimony established that he and Woodard were planning to purchase marijuana only.  This argument fails for four reasons.

First, the jury was free to credit Evans's testimony.  Evans testified to the meaning of various coded terms he used in his phone calls to set up the June 19 transaction with Robinson.  This testimony, along with the recorded conversations themselves, established that the planned transaction involved cocaine.

25

Second, binding precedent tells us that circumstantial evidence is sufficient to sustain both attempted possession of narcotics with intent to distribute, *see McDowell*, 250 F.3d at 1365, and liability on a theory of aiding and abetting, *see Pantoja-Soto*, 739 F.2d at 1525. Here, the recorded phone calls between Evans and Robinson never explicitly used the word "cocaine," but Evans twice testified that they were talking about cocaine rather than marijuana. This evidence was circumstantial—Evans was explaining his inference as to Robinson's meaning—and it sufficed to support Robinson's conviction.

Third, the jury was not required to accept at face value Woodard's testimony that the June 19 transaction involved marijuana rather than cocaine. They were free not only to discredit this testimony, but also to use it as substantive evidence against Woodard and Robinson if they believed Woodard was lying. *See United States v. Hough*, 803 F.3d 1181, 1188 (11th Cir. 2015) ("[H]aving seen and heard [the defendant's] testimony, the jury was free to discredit [his] explanation, to infer that the opposite of what [he] said was true, and to consider that inference as substantive evidence of [his] guilt."). Certainly, Woodard's testimony to the contrary does not undermine the sufficiency of the evidence supporting Robinson's conviction.

Fourth, based on the testimony of Munnerlyn and Evans, the jury reasonably could have inferred that a drug transaction involving Evans, Robinson, and

26

Woodard would involve cocaine rather than marijuana. These witnesses testified to years' worth of cocaine transactions among them but only ever mentioned small amounts of marijuana.

For the foregoing reasons, the evidence presented at trial was sufficient to sustain Robinson's conviction for aiding and abetting attempted possession of cocaine with intent to distribute.

## C.    Woodard's Possession of a Firearm in Furtherance of Drug Trafficking Conviction

Woodard challenges his 18 U.S.C. § 924(c) conviction for possessing a firearm in furtherance of drug trafficking. Although he admits to possessing firearms, he testified at trial and argues now that he possessed the firearms for legitimate purposes and not in furtherance of drug trafficking. But the location of the firearms, their proximity to cocaine "buy money," and Munnerlyn's and Evans's testimony that Woodard frequently carried a firearm during cocaine transactions counseled otherwise. So, too, did Woodard's testimony, which the jury was free to treat as evidence of his guilt. The evidence underlying Woodard's possession of a firearm charge was therefore sufficient.

### 1.    Woodard's Firearms

At trial, the government adduced evidence of Woodard's firearms usage. Evans reported seeing Woodard with a black firearm every time they transacted

27

business.  And Munnerlyn testified that he had seen Woodard with a black nine millimeter handgun both on his person and in his vehicle.

Woodard had several loaded firearms in his possession when his car was stopped by law enforcement on June 19.  Officer Boyce Rainey, a police officer for the Ocala Police Department, testified to pulling Woodard over that day.  He testified that inside the car police found a hidden backpack with money inside, two handguns in the glove compartment, and another handgun in the center console.  On cross-examination, Rainey conceded that Woodard had a concealed handgun permit, the firearms had not been brandished, and they were being lawfully carried.  Smith testified that the three firearms seized from Woodard's vehicle had been loaded.  Additionally, he testified that law enforcement found approximately $70,000 in the car.

Woodard testified in his own defense.  He acknowledged possessing firearms but denied that he did so to further drug trafficking.  He also explained that he had worked as an armed security guard for a short while.

### 2.    Woodard's Sufficiency Challenge

To sustain a conviction under § 924(c), the government was required to prove that Woodard "(1) knowingly (2) possessed a firearm (3) in furtherance of any drug trafficking crime for which he could be prosecuted in a court of the United States."  *United States v. Williams*, 731 F.3d 1222, 1232 (11th Cir. 2013).

28

Woodard does not contest that he knowingly possessed the three firearms recovered from his vehicle but argues that his possession was not in furtherance of a drug trafficking offense.

"A firearm is possessed in furtherance of a drug trafficking crime when the firearm helped, furthered, promoted, or advanced the drug trafficking." *Id.* (internal quotation marks omitted). "[T]he presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself" to prove the gun was possessed in furtherance of that crime. *United States v. Timmons*, 283 F.3d 1246, 1253 (11th Cir. 2002). Factors relevant to the whether the government proved the "in furtherance of" element include:

> (1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of the weapon; (4) whether the weapon is stolen; (5) the status of the possession (legitimate or illegal); (6) whether the gun is loaded; (7) proximity to the drugs or drug profits; and (8) the time and circumstances under which the gun is found.

*Williams*, 731 F.3d at 1232 (alteration and internal quotation marks omitted).

A significant amount of evidence suggested that Woodard possessed the firearms in furtherance of drug trafficking. Factors (2), (6), (7), and (8) above support this conclusion. His firearms were found in his car within easy reach, loaded, and in close proximity to roughly $70,000 in cash that the jury reasonably could have concluded was intended to be used to purchase cocaine. The jury also heard testimony from Evans and Munnerlyn that Woodard frequently brought a

29

firearm with him to drug transactions.  Moreover, Woodard testified at trial that he did not possess the firearms in furtherance of drug trafficking, and "having seen and heard [the defendant's] testimony, the jury was free to discredit [his] explanation, to infer that the opposite of what [he] said was true, and to consider that inference as substantive evidence of [his] guilt."  *Hough*, 803 F.3d at 1188. Based on evidence the jury heard, an opposite inference was reasonable.

There was also some evidence supporting Woodard's innocence.  Woodard argues that the three firearms police seized legitimately were in his possession pursuant to a concealed weapons permit (factor (5) above), that he was a former security guard (perhaps factor (8)), and that all the evidence above is equally susceptible to the interpretation that Woodard carried firearms only for legal purposes.

But a rational trier of fact could have inferred that he possessed firearms to further drug trafficking—for protection, for example.  *See, e.g., United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) ("[T]he fact finder is free to consider the numerous ways in which a firearm might further or advance drug trafficking.  For example, . . . . a gun could serve as protection in the event that a deal turns sour."). Drawing all inferences in the government's favor, the evidence underlying Woodard's § 924(c) conviction was sufficient.  *See Jiminez*, 564 F.3d at 1285.

30

## IV.    The Jury Instruction

Robinson challenges the district court's failure to instruct the jury in the manner he requested.  Specifically, he challenges the instruction given on the inability of government cooperators to be co-conspirators.  Robinson argues the instruction given might have led the jury to believe Evans was conspiring with Robinson while planning the fake June 19 drug transaction.  But the district court's instruction, though shorter than the one Robinson proposed, substantially covered the subject matter of Robinson's requested instruction.  The court's instruction was therefore proper.

At the charge conference, Robinson sought an instruction on the inability of government cooperators to enter into a conspiracy.  Given Evans's long period of cooperation with the government, Robinson wanted to make sure Evans was not viewed as a co-conspirator in setting up the June 19 transaction.  He submitted the following proposed instruction:

> Members of the jury, you are hereby instructed that after [Evans] agreed to cooperate with the government he became a government agent and informer. Once he became a government agent and informer, he could not be a co-conspirator with either or both of the defendants. Someone who acts as a government agent and enters into a purported conspiracy in the secret role of an informer or cooperating individual cannot be a co-conspirator.

31

The district court acknowledged that Robinson's proposed instruction was a correct statement of the law but indicated that such a lengthy instruction was unwarranted. The court instead instructed the jury:

> [A]nd someone who acts as a government agent or cooperator and purports to enter a conspiracy in the secret role of an informer cannot be a co-conspirator.

Robinson argues the district court's instruction on the inability of government cooperators to be co-conspirators given in lieu of his requested instruction was "incomplete and inadequate" and could have led the jury to believe it could convict him of conspiring with Evans during the time Evans was cooperating with the DEA and recording his phone calls. Robinson's Br. at 20.

We review the district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Jordan*, 582 F.3d 1239, 1247 (11th Cir. 2009). Such refusal constitutes reversible error if:

> (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself.

*United States v. Paradies*, 98 F.3d 1266, 1286 (11th Cir. 1996). This test is all-or-nothing, so failure to satisfy one of its prongs means the district court committed no reversible error. *See Jordan*, 582 F.3d at 1248; *Paradies*, 98 F.3d at 1287. "A district court has broad discretion in formulating" the jury instructions it gives.

32

*United States v. Snipes*, 611 F.3d 855, 867 (11th Cir. 2010) (internal quotation marks omitted).

Under the *Paradies* test's first prong, Robinson's requested instruction was a correct statement of the law. Indeed, it closely tracks language we approved in *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986), to instruct the jury on the so-called "*Sears* rule."[6]

And under the third prong of *Paradies*, refusal to give an instruction on the inability of a government informant to be a co-conspirator would likely be reversible error. The *Lively* case is instructive. There, as here, a government informer planned a drug transaction with the defendant during the period he was charged with conspiring to distribute cocaine. *See Lively*, 803 F.2d at 1125–26. In *Lively*, we held the district court's failure to provide a *Sears* instruction to be reversible error. *See id.* at 1128.

But we need not reach that question here because under the second prong, the district court's given instruction substantially covered the subject matter of Robinson's requested instruction. This Court recently explained that whether a given instruction substantially covered a requested one depended on "the size of the logical leap that a juror would need to make to get from the instruction the

---

[6] *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965), was the case in which our predecessor court announced the rule. Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

33

court gave to the instruction the defendant requested." *United States v. Takhalov*, 827 F.3d 1307, 1318 (11th Cir. 2016).

The only practical difference between the instructions here was that Robinson's proposed instruction made explicit that a person became a government agent after agreeing to cooperate with the government and at that moment became ineligible to enter into a conspiracy. The logical leap between the given and requested instructions was well within the ability of the jury to make. *Cf. United States v. Hill*, 643 F.3d 807, 852–54 (11th Cir. 2011) (upholding jury instructions where jury had to infer that a person cannot lie "willfully" if he speaks what he believes to be the truth); *United States v. Martinelli*, 454 F.3d 1300, 1315–16 (11th Cir. 2006) (upholding instructions where jury had to infer that mail fraud was not legitimate business).

This logical leap was far smaller than the leap we found problematic in *Takhalov*. *See* 827 F.3d at 1318 (holding the inference "that a person is not 'deceived or cheated out of money or property' if he gets exactly what he paid for even though he is deceived into paying in the first place" required too great a logical leap). The district court's instruction substantially covered the subject matter of Robinson's proposed instruction, so there was no abuse of discretion.

34

## V.    Conclusion

For all of the foregoing reasons, we affirm Woodard and Robinson's convictions and sentences.

**AFFIRMED.**